810 A.2d 1185

CITY OF PITTSBURGH

v.

Patrick LOGAN.

Appeal of City of Pittsburgh/Frank Gates Service Company.

Supreme Court of Pennsylvania.

Argued Sept. 10, 2002.

Decided Nov. 20, 2002.

502

Dale Aaron Cable, Pittsburgh, for City of Pittsburgh/Frank Gates Services Company.

Bryan Campbell, Pittsburgh, for Patrick Logan.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION

Justice EAKIN.

The City of Pittsburgh challenges the award of benefits under the Heart and Lung Act, 53 P.S. § 637, for the psychic injuries sustained by Patrick Logan, a Pittsburgh police officer, in connection with his official duties.

In September 1998, appellee felt ill at work and went home early. The next day, while waiting to testify in court, he experienced flashbacks of incidents from his career. Appellee described these as including "[s]hooting incidents that I've had over the years, the fact that one time I had carried a baby out of a house that a father had shot in the head and took to the hospital and couldn't save, just a lot of gory stuff that happened that just started coming back like a flood. Then I thought I was going to die." N.T., 2/3/99, at 27.

Unable to get out of his chair, appellee was taken by ambulance to the emergency room, and his condition required three days of inpatient psychiatric treatment. Appellee has been receiving psychiatric care ever since, and has not returned to work.

Appellee filed for disability benefits pursuant to the Heart and Lung Act. The city denied appellee's claim, and the matter proceeded to arbitration. There, appellee testified that since he began his career with the Pittsburgh police department in 1969, he had been involved in seven police-related shootings. In November 1993, a gang member shot at appellee at close range; appellee and other officers returned fire, killing the suspect. Appellee was cleared of any wrong-

doing, but because of the publicity, appellee and the other officers were transferred for their safety.

Appellee testified his supervising officer, Lieutenant Dacey, advised him the police received information that members of the same gang had placed a $50,000 bounty on appellee and his family. Appellee testified his son received death threats from gang members while at school. As a result, appellee suffered from insomnia, crying for no apparent reason, nightmares, and outbursts of anger at his spouse. He sought counseling and did not miss any work due to his psychological difficulties, which gradually diminished.

Lieutenant Dacey testified it was common for police officers to receive threats. N.T., 2/19/99, at 6. However, the threat against appellee was "the most serious threat [Lieutenant Dacey] ha[d] ever received on an officer." N.T., 1/11/99, at 12. Lieutenant Dacey stated that he had never heard of another instance where a bounty or contract was placed on an officer. N.T., 2/19/99, at 13–14. Lieutenant Dacey considered the bounty to be "very credible." *Id.*, at 15.

From 1994 until 1996, appellee worked as an undercover detective without experiencing any relevant work incidents. In 1996, appellee returned to patrol duties. Between November 1997 and May 1998, appellee was assaulted four times while assisting in arrests. In one incident, he was punched and kicked while attempting to apprehend an armed rape suspect. In the second episode, appellee wrestled with an HIV-positive prostitute who scratched, bit, and spat at him. The third incident involved a drug arrest that resulted in a fight with the suspect. In May 1998, a suspect kneed appellee's groin, causing him to miss two weeks of work. After this last assault, appellee had a reoccurrence of the psychological problems that followed the gang shooting. Appellee attempted to see Dr. Gerald Massaro, a psychologist employed by the city, but was unable to meet him due to the high demand for Dr. Massaro's services.

The arbitrator awarded benefits, finding appellee proved he suffered a disabling post traumatic stress disorder and panic

disorder as the result of abnormal working conditions in the course of duty. The arbitrator found, "[i]n the instant case, the credible and consistent testimony of Claimant and his witnesses, particularly Lieutenant Dacey who distinguished Claimant's experiences from normal typical experiences is persuasive of the requisite abnormal working conditions." Arbitrator Opinion, 7/7/99, at 9.[1]

The city appealed to the trial court, which affirmed, concluding this matter was controlled by *City of Phila. v. Civil Serv. Comm'n. (Ryder)*, 712 A.2d 350 (Pa.Cmwlth.1998), a case where the Commonwealth Court upheld an award of benefits to a police officer who claimed a work-related psychic injury controlled.

The city appealed to the Commonwealth Court. *City of Pittsburgh v. Logan*, 780 A.2d 870 (Pa.Cmwlth.2001). Recognizing this Court reversed the Commonwealth Court's decision in *Ryder, see City of Phila. v. Civil Serv. Comm'n. (Ryder)*, 565 Pa. 265, 772 A.2d 962 (2001), President Judge Doyle, writing for the majority, stated: "the essential issue presented is whether there are *ever* any working conditions that can be considered abnormal for a police officer, given the highly stressful nature of a police officer's daily work life; we believe that there may be, and that this is such a case." *Logan*, at 872 (emphasis in original). The majority, relying on the testimony of appellee and Lieutenant Dacey, held:

In summary, it is our opinion that [appellee] is entitled to benefits for a mental/mental injury where he proved *not only* that he suffered an unusual work event that resulted in a mental disability, but also that the *cumulative* effects of that unusual event were compounded by other factors, most notably, four violent episodes occurring in no more than a six-month period. These factors were, of course, directly related to his duties as a police officer, and, all of them, most remarkably, the death threats, rose to the level of abnormal working conditions, even for a police officer.

1. The city presented no witnesses. *Id.*, at 2. Since the city does not challenge the facts, we shall consider them to be supported by substantial evidence.

*Id.,* at 877–78 (emphasis in original, footnote omitted). The Commonwealth Court affirmed the award of benefits on different grounds than the trial court, due to the death threat and other unrelated violent episodes.[2] The city petitioned for allowance of appeal, which was granted.

 To recover benefits for a work-related psychic injury caused by psychological stimuli, appellee must prove by objective evidence he suffered a psychic injury, which is not just a subjective reaction to normal working conditions. *See Martin v. Ketchum, Inc.,* 523 Pa. 509, 568 A.2d 159, 164–65 (1990).[3] The city does not contest appellee established a causal relationship between his psychic injury and his work environment, but contends appellee failed to prove his working conditions rose to the level of abnormality. Whether the findings of fact support the conclusion that appellee was exposed to abnormal working conditions is a question of law fully reviewable on appeal. *Wilson v. WCAB (Aluminum Co. of America),* 542 Pa. 614, 669 A.2d 338, 343 (1996).

In *Brasten,* a Philadelphia police officer claimed psychic injuries because of publicity surrounding his trial on man-

2. Judge Friedman dissented. In Judge Friedman's view, this Court's decisions in *Ryder, Davis v. WCAB (Swarthmore Borough),* 561 Pa.462, 751 A.2d 168 (2000), and *City of Phila. v. WCAB (Brasten),* 556 Pa.400, 728 A.2d 938 (1999), precluded a finding of abnormal working conditions based on events cited by the majority. However, Judge Friedman noted the city's failure to provide psychiatric counseling in May 1998, may qualify as an abnormal working condition. Accordingly, Judge Friedman believed the case should be remanded to the arbitrator for consideration of this factor.

3. Psychological or mental disabilities may be compensable if the other elements needed to establish a claim are met. There are three distinct types of disabilities involving psychological or mental elements: (1) psychological stimulus causing physical injury, the mental/physical association; (2) physical stimulus causing psychic injury, the physical/mental association; (3) psychological stimulus causing psychic injury, the mental/mental association. *Volterano v. WCAB,* 149 Pa.Cmwlth. 222, 613 A.2d 61, 63 (1992), *aff'd,* 536 Pa. 335, 639 A.2d 453 (1994). The burden of proof for claims of mental/mental injuries under the Heart and Lung Act and the Workers' Compensation Act are the same. *Rodgers v. Pa. State Police,* 759 A.2d 424, 429 (Pa.Cmwlth.2000), *appeal denied,* 565 Pa. 658, 771 A.2d 1292 (2001); *see also Ryder,* at 965–66 (applying burden of proof in Workers' Compensation cases to disability cases before Philadelphia Civil Service Commission).

slaughter charges arising from his shooting of a suspect; this Court being evenly divided, the order denying benefits was affirmed. The Opinion in Support of Affirmance concluded the officer's grand jury investigation, indictment, trial, and media attention did not constitute abnormal working conditions because they were not related to the officer's employment. *Id.*, at 940–41. The Opinion in Support of Reversal, however, noted the uncontradicted testimony of two police captains who considered the criminal charges and subsequent events to be abnormal. *Id.*, at 942. This testimony was considered sufficient to satisfy the burden of establishing abnormal working conditions by objective evidence. *Id.*

The following year, in *Davis*, an officer asserted psychic injury as a result of "repeated stressful and life-threatening experiences during the course of his duties as a police officer," which included confrontations with armed suspects and threats by members of a motorcycle gang "to shoot him and his family to prevent him from testifying at trial." *Id.*, at 170–01. The award of benefits was held improper because the officer failed to establish by objective evidence his working conditions were abnormal. This Court concluded "[t]here was absolutely no evidence that the investigatory and patrol functions performed by [the officer] or his experiences were unusual for a law enforcement officer." *Id.*, at 177.

In *Ryder*, a Philadelphia police officer had a standoff with an armed man, who confronted the officer and pointed a semi-automatic rifle at him. When the officer later claimed psychic injury because of the standoff, several police officers testified: (1) it was unusual for an officer to confront the situation alone; (2) situations involving semi-automatic rifles were uncommon, but not rare; (3) officers are trained with guidelines on how to respond to armed suspects because it is difficult to predict how the suspect will react; (4) incidents of this nature were increasing in regularity; and (5) delays in response times could be a daily event depending on the hour of the day, tour of duty, and manpower. This Court concluded the officer failed to meet his burden of proving psychic injury as a result of abnormal working conditions. *Id.*, at 969.

These rulings do not hold psychic injuries arising from police officers' duties are noncompensable *per se*. As observed by the Opinion in Support of Reversal in *Brasten*, and analyzed by the majorities in *Davis* and *Ryder*, the pivotal issue is whether sufficient objective evidence exists to establish abnormal working conditions.

The city argues the Commonwealth Court erred by considering appellee's cumulative experience of being assaulted four times in six months: the Commonwealth Court stated there were "other factors" compounding the "unusual work event," but found the four assaults most notable. *Logan*, at 877. Such a cumulative experience, the city asserts, does not amount to an abnormal work experience for a police officer.

In *Ryder*, this Court reiterated the *Martin* standard: regardless of whether there were relevant events over time, or a specific event, the claimant must prove the events were abnormal. *Id.*, at 967. The Commonwealth Court noted appellee testified about the actual assaults, not his subjective feelings, and concluded his testimony alone was sufficient to establish these four incidents constituted an abnormal working environment. *Logan*, at 877 n. 9. However, "even if a claimant adequately identifies actual (not merely perceived or imagined) employment events which have precipitated psychiatric injury, the claimant must still prove the events to be abnormal before he can recover." *Antus v. WCAB*, 155 Pa.Cmwlth. 576, 625 A.2d 760, 766 (1993), *aff'd. per curiam*, 536 Pa. 267, 639 A.2d 20 (1994), *as quoted in Wilson*, at 344; *Ryder*, at 967.

Confronting violence is not an everyday part of an officer's duties, but that does not make it abnormal. Violence may never be routine to an officer, but it unfortunately is not abnormal. Indeed, the very frequency of the incidents speaks against their abnormality. Accordingly, the evidence does not show these unrelated violent episodes *by themselves* rose to the level of an abnormal working condition.

The city also argues this Court has previously decided threats against police officers do not give rise to an abnormal work environment. The threats by a motorcycle

gang against the police officer and his family were not deemed abnormal in *Davis.* The threat the armed suspect posed during the standoff in *Ryder* was not deemed abnormal. Therefore, the city argues, threats are not an abnormal working condition for a police officer. However, the evaluation of threats in *Davis* and *Ryder* does not mean, as a matter of law, all types and manners of threats may be anticipated in the course of an officer's duties. "Psychic injury cases are highly fact-sensitive and for actual work conditions to be considered abnormal, they must be considered in the context of the specific employment." *Ryder,* at 966 (quoting *Wilson,* at 343).

The circumstances in which police officers must confront and apprehend suspects are often stressful, and to others these circumstances may be considered abnormal, but it is a regrettable reality of law enforcement that suspects often make spontaneous threats against police officers. These are not abnormal. Lieutenant Dacey captured the essence of this reality when he stated, "I think everyone on this job gets a threat sooner or later, to one degree or another." N.T., 2/19/99, at 6.

However, we cannot say that the gang threat here was garden variety. The Lieutenant deemed this death threat, which included a $50,000 bounty, "very credible"; he testified this was the first time he heard of this type of threat. It does not smack of spontaneity or being caused by the heat of the incident. To the contrary, it reflects post-incident planning, with a price tag that invites credibility among those of the world willing to qualify for entitlement to it. Death threats to appellee's child at school are likewise not part of the normal officer's experience.

As set forth in *Martin,* appellee bore the burden of proving an abnormal work condition by sufficient objective evidence. While the city argues the facts do not support this conclusion, the city does not dispute the objectivity of Lieutenant Dacey, nor did the city present any rebuttal witnesses or contrary evidence. Despite the city's argument, credible testimony indicates the bounty was extraordinary. While this period predated his collapse, it undoubtedly set the stage for it when

the cumulative assaults occurred, and enhanced their effect. We cannot disregard competent and credible evidence concerning the abnormality of this police officer's work conditions.

It will always be difficult for a person in a profession where dangerous conditions are normal, to prove entitlement under this statute. However, in this case, objective evidence exists to support the conclusion appellee has proved his working conditions were abnormal.

The order of the Commonwealth Court is affirmed. Jurisdiction is relinquished.

Chief Justice ZAPPALA concurs in the result.